**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Case No.** _____

JOHN DOE and JANE DOE,

Plaintiffs,

v.

Case: 1:25−cv−04581 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 12/3/2025
Description: Pro Se Gen. Civ. (F−DECK)

PALANTIR TECHNOLOGIES INC.,

PETER THIEL, individually and in his official capacity as

Founder and Officer of Palantir Technologies,

ALEX KARP, in his personal and official capacity;

SHYAM SANKAR, in his personal and official capacity

ALL OFFICERS AND DIRECTORS OF  PALANTIR TECHNOLOGIES,

DOES 1–50, inclusive,

Defendants.



**RECEIVED**

DEC 03 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

VERIFIED COMPLAINT – DOES V. PALANTIR, ET. AL                    |1 of  59

TABLE OF CONTENTSTABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................2
TABLE OF EXHIBITS ............................................................3

**Verified Complaint**

I. Jurisdiction and Venue ...................................................... 5
II. Parties ............................................................................ 6
III. Factual Allegations ...................................................... 8
     A. General Allegations ........................................ 8
     B. Palantir's Obsolescence Agenda ................................. 14
     C. Manipulated Reality and Manufactured Experience .... 16
     D. Manipulation of Children ............................................. 18
     E. Vulnerability of Elderly and Disabled ......................... 20

IV. Causes of Action
     Count I — Civil RICO (18 U.S.C. §§ 1962(c), 1962(d)) ........ 22
     Count II — §1983 Constitutional Violations ......................... 24
     Count III — §1985(3) Conspiracy / §1986 Liability ........... 26
     Count IV — ECPA & SCA Violations ................................... 27
     Count V — CFAA Violations ................................................ 29
     Count VI — Invasion of Privacy (Intrusion) ........................ 31
     Count VII — Intentional Infliction of Emotional Distress . 32
     Count VIII — Declaratory & Injunctive Relief .................. 33

V. Summary Paragraph ...................................................... 35
VI. Jury Trial Reservation ................................................... 36
VII. Relief Requested ........................................................... 37
VIII. Verification Statements ............................................... 40
IX. Signature Blocks .......................................................... 41

## TABLE OF AUTHORITIES

United States Supreme Court Cases

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ............................ 23
*Katz v. United States*, 389 U.S. 347 (1967) ......................................... 23
*Riley v. California*, 573 U.S. 373 (2014) ............................................ 23
*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989) ............ 24
*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) . 24
*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................... 25
*Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990) ................ 25
*United States v. Jones*, 565 U.S. 400 (2012) ...................................... 23
*Obergefell v. Hodges*, 576 U.S. 644 (2015) ........................................ 25
*Stanley v. Georgia*, 394 U.S. 557 (1969) ............................................ 24

Federal Statutes
42 U.S.C. § 1983

42 U.S.C. § 1985
42 U.S.C. § 1986
18 U.S.C. §§ 1961–1964 (RICO)
18 U.S.C. §§ 2510–2522 (ECPA)
18 U.S.C. § 1030 (CFAA)
28 U.S.C. §§ 1331, 1367, 1391
UDHR (Persuasive)
ICCPR (Persuasive)
Nuremberg Code (Persuasive)

**TABLE OF EXHIBITS**

Exhibit A — C.L.O.N.E. Act of 2025 – Codified Definitions

• Publicly recorded in Pima County, Arizona
• Governing definitions for Artificial Intelligence, Synthetic Intelligence, Neurotechnology, Smart Dust, etc.

Exhibit B — Evidence of Biometric Capture & Device Coercion

• Screenshots of forced OS updates
• Photos of biometric prompts (face unlock, Android/Google controls)
• Examples of E911 permanent activation mechanisms

Exhibit C — Social Media Deplatforming & Economic Harm

• Termination notice from YouTube
• Revenue screenshots (YouTube Studio)
• Facebook & X/Twitter takedown communications
• Shadowban evidence (reach graphs, screenshots)

Exhibit D — Palantir Government Contracts & Public Disclosures

• DHS contract releases
• DoD contracting documents
• FOIA-released materials
• Public statements by Palantir executives

Exhibit E — Evidence of Predictive Policing & Algorithmic Discrimination

• Articles documenting cases of wrongful arrests
• FOIA or public records tying Palantir to fusion centers
• Known risk-assessment failure cases

Exhibit F — COVID-Era Pressure Campaigns & Enforcement Tools

• Mandate enforcement screenshots
• Official agency memos using Palantir dashboards
• Publicly released data integration maps

Exhibit G — Evidence of Geoengineering, Atmospheric Manipulation, & Nanotech Spread

• NASA/NOAA aerosol release documentation
• Peer-reviewed materials on atmospheric particulates
• Comparative photographs (non-location-identifiable)
• Smart-dust / Nano-sensor patent records

Exhibit H — Education Platforms & AI-Driven School Systems

• Screenshots of AI-integrated learning systems
• Examples of indoctrination/content filtering
• Toy/device recordings of data capture (if available)

Exhibit I — Elder Care, Medical AI & Risk of Non-Consensual Decisions

• Hospital/insurance AI policy documents
• Medical AI triage guidelines
• Academic articles on "AI euthanasia risk scoring"

Exhibit J — Public Interviews with Peter Thiel

• Transcript excerpts with Ross Douthat ("Should humanity survive?")
• Videos/articles showing Thiel's "post-human" philosophy

Exhibit K — Miscellaneous Supporting Evidence

• Additional patents
• Academic research
• Peer-reviewed articles
• Any evidence showing Palantir's monopoly expansion

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Case No. _____**

| | |
|---|---|
| JOHN DOE and JANE DOE, | ) |
|                              Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| PALANTIR TECHNOLOGIES INC., | ) |
| PETER THIEL, individually and in his | ) |
| official capacity as Founder and Officer | ) |
| of Palantir Technologies, | ) |
| ALEX KARP, in his personal and official capacity; | ) |
| SHYAM SANKAR, in his personal and official capacity | ) |
| ALL OFFICERS AND DIRECTORS OF | ) |
| PALANTIR TECHNOLOGIES, | ) |
| DOES 1–50, inclusive, | ) |
|                              Defendants. | ) |

---

**VERIFIED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND JURY DEMAND**

COMES NOW the Plaintiffs, JOHN DOE and JANE DOE, private living man and woman, proceeding *sui juris* and not as sureties or representatives of any artificial legal fiction, who hereby submit this VERIFIED COMPLAINT against Defendants Palantir Technologies Inc., Peter Thiel, Alex Karp, Shyam Sankar, and all officers and directors of Palantir Technologies, jointly and severally.

This action arises from Defendants' development, deployment, and profiting from Artificial Intelligence and **Synthetic Intelligence** systems that unlawfully interfere with the rights, liberties, and private lives of Plaintiffs and all similarly situated Living Men and Women.

Defendants, including Palantir Technologies Inc. and its officers Peter Thiel, Alex Karp,

and Shyam Sankar, have designed and integrated technologies that simulate cognition, predict human behavior, manipulate decision-making, and impose digital surveillance on individuals without informed consent. These technologies constitute an invasive merger of machine reasoning with human neurological processes, amounting to Trespass, coercion, and violations of Cognitive Liberty.

On September 3, 2025, Plaintiffs filed and recorded in the public records of Pima County, Arizona the *C.L.O.N.E. Act of 2025 – Exhibit A: Codified Definitions* ("Exhibit A"). Exhibit A is incorporated herein by reference and provides controlling definitions for Artificial Intelligence, Synthetic Intelligence, Neurotechnology, Smart Dust, and related systems. By operation of law and constructive notice, Defendants are bound by these definitions and may not evade liability through rebranding, renaming, or technical evasions.

Defendants' conduct has directly harmed Plaintiffs John Doe and Jane Doe, who proceed pseudonymously to protect their safety, and has likewise endangered the rights, privacy, and survival of all similarly situated Living Men and Women. Plaintiffs seek declaratory and injunctive relief to prohibit Defendants' unlawful use of Synthetic Intelligence and related technologies, and damages for the violations already inflicted.

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to **28 U.S.C. § 1331**, because this action arises under the Constitution and laws of the United States, including the C.L.O.N.E. Act of 2025, the First, Fourth, Fifth, Ninth, and Fourteenth Amendments, the Civil Rights Act (42 U.S.C. § 1983), the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.), the Electronic Communications Privacy

Act (18 U.S.C. § 2510 et seq.), the Computer Fraud and Abuse Act (18 U.S.C. § 1030), and the Sherman and Clayton Antitrust Acts (15 U.S.C. §§ 1–2, 15).

2. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related common law claims, including invasion of privacy, intentional infliction of emotional distress, and unjust enrichment, as these claims form part of the same case or controversy.

3. This Court also has jurisdiction pursuant to the Alien Tort Statute (28 U.S.C. § 1350), and under treaties ratified by the United States including the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the Nuremberg Code, and UNESCO Declarations on Bioethics and Human Rights. These sources provide additional persuasive authority and reinforce the recognition of cognitive liberty, bodily autonomy, and informed consent as binding principles under both U.S. and international law.

4. Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b) because Palantir conducts substantial business with the United States Government and its agencies headquartered in this District. Decisions regarding the design, deployment, and oversight of Palantir's artificial intelligence systems are directed and implemented from Washington, D.C., and the harms alleged herein directly arise from such conduct.

5. Defendants Peter Thiel, Alex Karp, Shyam Sankar, and the officers and directors of Palantir Technologies, Inc., in both their personal and official capacities, acted under color of law by contracting with federal agencies and engaging in joint operations with the U.S. government that resulted in deprivation of Plaintiffs' constitutional rights.

6. Palantir Technologies Inc. maintains significant contracts with the United States government, including but not limited to the Department of Defense, the Department of Homeland Security, and intelligence agencies, thereby placing its conduct squarely within the jurisdiction of this Court as affecting interstate commerce, constitutional rights, and international obligations.

7. This Court has jurisdiction over all claims raised herein, including those arising from Defendants' deployment of Artificial Intelligence and Synthetic Intelligence systems as defined in Exhibit A, which Plaintiff has duly filed as public notice.

## II. PARTIES

8. **8.** Plaintiff John Doe is an adult citizen of the United States, proceeding pseudonymously due to credible threats of retaliation, surveillance, harassment, and physical harm should his identity be revealed. John Doe has been directly subjected to biometric surveillance, unlawful data collection, censorship, and coercion by Defendants' technologies, infringing upon his constitutional rights, liberty, and privacy. John Doe also brings this action on behalf of all Living Men and Women similarly situated who are subjected to Defendants' unlawful use of Artificial Intelligence, Synthetic Intelligence, Neurotechnology, and related systems as defined in Exhibit A.

**9.** Plaintiff Jane Doe is an adult citizen of the United States, likewise proceeding pseudonymously to protect her safety and privacy due to threats of retaliation and targeted surveillance. Jane Doe has been subjected to biometric capture, digital profiling, censorship, and manipulation by Defendants' technologies, resulting in direct harm to her rights, safety, and well-being. Jane Doe also brings this action on behalf of

all Living Men and Women similarly situated.

**10.** Defendant Palantir Technologies Inc. ("Palantir") is a corporation organized under the laws of Delaware with its principal place of business in Denver, Colorado. Palantir contracts extensively with agencies of the United States Government headquartered in the District of Columbia, including the Department of Defense, the Department of Justice, the Department of Homeland Security, and the Central Intelligence Agency. Palantir is engaged in the design, sale, and deployment of Artificial Intelligence and Synthetic Intelligence systems that conduct surveillance, data collection, behavioral profiling, and manipulation against Plaintiffs and the general public.

**11.** Defendant Peter Thiel is the founder and an officer of Palantir. He is sued in both his individual and official capacities. Thiel exercises substantial control over Palantir's policies and strategic direction, including its Synthetic Intelligence research and deployment. He has publicly expressed hesitation about the value of human survival and has advanced a technological agenda that threatens to make human beings obsolete.

**12.** Defendant Alex Karp is the Chief Executive Officer of Palantir. He is sued in both his individual and official capacities. Karp oversees Palantir's domestic and international operations and is directly responsible for the integration of Palantir's Artificial Intelligence and Synthetic Intelligence technologies into government and civilian life, causing harm to Plaintiffs and the general public.

**13.** Defendant Shyam Sankar is the Chief Operating Officer of Palantir. He is sued in both his individual and official capacities. Sankar directs Palantir's commercial and

governmental projects and is directly responsible for the ongoing deployment of Palantir's Artificial Intelligence and Synthetic Intelligence systems that have harmed Plaintiffs and all similarly situated Living Men and Women.

**14.** Defendants Does 1–50 are officers, directors, employees, contractors, or affiliates of Palantir whose identities are currently unknown to Plaintiffs. Plaintiffs allege on information and belief that Does 1–50 directly participated in, authorized, or knowingly permitted the unlawful conduct described herein, including the research, development, and deployment of Artificial Intelligence, Synthetic Intelligence, and related technologies. Plaintiffs will amend this Complaint to substitute the true names and capacities of these Defendants when ascertained.

### III. FACTUAL ALLEGATIONS

### A. General Allegations

14. Plaintiffs allege that Palantir Technologies Inc. ("Palantir") was co-founded by Peter Thiel and has, since inception, developed enterprise platforms for large-scale data fusion, surveillance, and artificial intelligence analytics used by government and corporate clients.

15. Plaintiffs allege that Palantir's core platforms—commonly known as Gotham, Foundry, and MetaConstellation—are designed to ingest biometric, geospatial, communications, financial, medical, and behavioral data to construct persistent "pattern-of-life" profiles on individuals and populations.

16. Plaintiffs allege that Palantir contracts with federal agencies headquartered in the District of Columbia, including components of the Department of Homeland Security,

the Department of Defense, and public-health authorities, to deploy these platforms in ways that materially affect Plaintiffs' rights and daily lives.

17. Plaintiffs allege that Defendants Thiel, Karp, and Sankar exercise executive control over Palantir's policies, roadmap, sales, and deployment decisions, and that each knowingly authorized, ratified, or deliberately disregarded the unlawful practices described herein.

18. Plaintiffs allege they have been compelled to submit to biometric collection— including facial recognition at airport checkpoints and fingerprint/face unlock on personal devices—under penalty of denial of travel or loss of essential device functions.

19. Plaintiffs allege that Palantir's platforms interoperate with biometric streams from airports, motor-vehicle databases, retail cameras, mobile devices, and "smart" infrastructure, enabling continuous identification and tracking without Plaintiffs' informed consent.

20. Plaintiffs allege that operating-system "updates" and app-level permissions regimes function as covert data-capture expansions that Plaintiffs cannot meaningfully refuse without losing core communications and commerce capabilities.

21. Plaintiffs allege that Google/Android and comparable ecosystem data—searches, location, voice, app telemetry—are routinely processed within, or made interoperable with, Palantir-style data-fusion environments used by government and allied corporate partners.

22. Plaintiffs allege that emergency-services functionality (e.g., E911) is engineered to operate even when other phone services are limited, creating a coercive dependency that ensures individuals must carry trackable devices at all times.

23. Plaintiffs allege that Palantir's risk-assessment and justice-analytics tools influence detention, release, and supervision decisions and, when configured with intentional weighting, can systematically understate violent-offender risk and contribute to dangerous releases.

24. Plaintiffs allege that such configuration is not merely "error" but a foreseeable and, upon information and belief, deliberate policy outcome that heightens public fear and drives deeper societal dependence on Palantir-integrated surveillance infrastructure.

25. Plaintiffs allege that Palantir's predictive-policing deployments in patrol cars, fusion centers, and mobile devices cause vehicles and persons to be flagged for "enhanced" stops based on algorithmic classifications rather than individualized probable cause.

26. Plaintiffs allege they reasonably fear leaving their property because Palantir-enabled alerts expose them to arbitrary stops, force, seizure, and imprisonment for non-criminal infractions or mere "non-compliance."

27. Plaintiffs allege that Palantir-integrated law-enforcement systems collect, store, and disseminate Plaintiffs' communications metadata and locations following stops, compounding the unlawful invasion of privacy.

28. Plaintiffs allege that Palantir contracts and coordination with platforms and agencies engaged in "misinformation/disinformation" policing have resulted in the suppression,

demonetization, and removal of Plaintiffs' lawful speech and accounts.

29. Plaintiff Jane Doe alleges that her YouTube channel (exceeding 90,000 subscribers and generating $6,000–$8,000 per month) was targeted by automated moderation and then terminated without due process, causing substantial economic loss.

30. Plaintiffs allege that similar bot-targeting and coordinated takedowns occurred on Facebook and Twitter/X, erasing years of work and further depriving Plaintiffs of income and public participation.

31. Plaintiffs allege that Palantir's platforms are used to coordinate or support "ephemeral experience" manipulation—short-lived prompts, feeds, and nudges—to steer beliefs, choices, and emotions without leaving a durable evidentiary trail.

32. Plaintiffs allege that such ephemeral manipulation constitutes covert psychological experimentation and violates cognitive liberty by bypassing conscious, informed consent.

33. Plaintiffs allege that Palantir's systems are integrated with public-health data hubs used during COVID-19, enabling mandate enforcement, access restrictions, and targeted pressure against those asserting medical autonomy.

34. Plaintiffs allege that refusal to comply with mandates led to credible threats of arrest, denial of access to services, and intimidation by armed officers, all supported by Palantir-enabled data pipelines.

35. Plaintiffs allege that Palantir's MetaConstellation and Foundry are used to model, coordinate, or support geoengineering and atmospheric-seeding operations that release

particulates and nanotechnology into the air, contaminating soil and water.

36. Plaintiffs allege that as a result, home gardens and crops cannot be sustained without resorting to commercially controlled products that are themselves infused with undisclosed technological additives.

37. Plaintiffs allege that retail environments (including big-box stores) deploy facial recognition and behavior-analytics systems that are interoperable with Palantir-style platforms, surveilling shoppers without meaningful notice or consent.

38. Plaintiffs allege that Palantir's supply-chain analytics integrate agricultural, pharmaceutical, and consumer-goods telemetry, enabling end-to-end observation of what Plaintiffs buy, eat, and use.

39. Plaintiffs allege that Palantir's data models assign behavioral and "mental-stability" risk scores that can trigger involuntary wellness checks, psychiatric holds, and forced medication under color of law.

40. Plaintiffs allege that the threat of being labeled "mentally unstable" for refusing technological mandates is a powerful coercive mechanism that chills speech and compels conformity.

41. Plaintiffs allege that Palantir's election-related analytics and cross-checks, when combined with biometric surveillance, enable algorithmic disenfranchisement by selectively flagging or suppressing voters through automated risk designations.

42. Plaintiffs allege they face ongoing risk that their ballots could be denied, delayed, or nullified by AI-driven classifications without transparent process or appeal.

43. Plaintiffs allege that Palantir's dominance in data fusion and neuro-behavioral analytics, combined with deep government entanglement, creates a de facto monopoly that deprives citizens of any realistic opt-out from surveillance.

44. Plaintiffs allege that device "consent" flows are deceptive and coercive: refusal leads to loss of essential functions, and acceptance is neither informed nor voluntary under any meaningful legal standard.

45. Plaintiffs allege that Defendants designed and profit from a closed system in which survival—communication, travel, work, healthcare, food, and shelter—requires submission to Palantir-integrated surveillance and behavioral control.

46. Plaintiffs allege that Palantir's revenue and contract growth are directly tied to expanding the scope and intensity of surveillance, risk scoring, and enforcement, incentivizing escalation of the very harms described herein.

47. Plaintiffs allege that Palantir markets its tools as safety-enhancing while engineering conditions—such as algorithmic releases of violent offenders—that predictably increase fear and perceived need for more surveillance.

48. Plaintiffs allege that Defendants knew or should have known that these systems would result in unlawful arrests, excessive force, and deprivation of liberty for citizens who had committed no crime.

49. Plaintiffs allege that Palantir's systems enable re-identification of "anonymized" data, defeating privacy assurances and allowing continuous tracking and dossier expansion on Plaintiffs.

50. Plaintiffs allege that Palantir's platforms retain and propagate erroneous or defamatory labels ("threat," "unstable," "extremist"), causing reputational, economic, and emotional harm.

51. Plaintiffs allege that Palantir's data sharing with third parties, contractors, and foreign partners occurs without Plaintiffs' knowledge, meaningful notice, or opportunity to object.

52. Plaintiffs allege that emergency-services integrations (including E911 routing and telephony metadata) serve as persistent geolocation and identity anchors within Palantir-style data fusion environments.

53. Plaintiffs allege that "forced OS updates" install expanded surveillance and AI modules during nighttime or idle windows, without clear disclosure of new data capture or downstream sharing.

54. Plaintiffs allege that "smart" home devices, vehicles, and appliances capture constant ambient audio, video, and telemetry that are processed by or interoperable with Palantir-enabled analytics.

55. Plaintiffs allege that children's devices, toys, and education platforms capture statements that may be misconstrued as confessions or accusations, generating risk flags against adults without context or due process.

56. Plaintiffs allege that Palantir's behavioral models are tuned to maximize engagement, compliance, and revenue, not truth, fairness, or constitutional fidelity.

57. Plaintiffs allege that even nominally "organic" or "non-GMO" agricultural inputs are

increasingly coupled to Palantir-tracked logistics, creating dependency loops that undermine Plaintiffs' efforts to live free of technological contamination.

58. Plaintiffs allege that Defendants' conduct chills Plaintiffs' speech, association, movement, religious exercise, medical autonomy, and political participation.

59. Plaintiffs allege that these injuries are concrete, particularized, and ongoing, including economic losses from deplatforming, loss of audience and archives, emotional distress, and constant fear of unlawful detention or force.

60. Plaintiffs allege that the harms are fairly traceable to Defendants because Palantir designs, deploys, and profits from the interoperable systems that collect, fuse, score, and act upon Plaintiffs' data across domains.

61. Plaintiffs allege that the injuries are redressable by this Court through injunctive, declaratory, and monetary relief, including structural remedies limiting Palantir's role in law enforcement, public health, and critical infrastructure.

62. Plaintiffs allege that Does 1–50 include Palantir officers, engineers, contractors, integrators, and government collaborators who participated in, profited from, or knowingly facilitated the unlawful practices herein.

63. Plaintiffs allege that, taken together, Defendants' conduct constitutes coordinated coercion, surveillance, manipulation, and endangerment of civilians, meeting the elements of enterprise conspiracy, civil-rights deprivations under color of law, and—by statutory definition—domestic terrorism designed to intimidate and control a civilian population.

64. Plaintiffs allege that Palantir's long-term strategic objective is to render human labor, independence, and free decision-making obsolete, replacing them with robotic systems and artificial intelligence that are controlled and monetized by Defendants.

65. Plaintiffs allege that Palantir pursues this goal through the creation of predictive, manipulative, and replacement technologies that are intentionally designed to diminish human autonomy while expanding technological control over daily life.

66. Plaintiffs allege that Palantir's methods of control include the use of AI-written policies, procedures, training videos, and devices that dictate behavior and enforce compliance by embedding instructions into the very tools individuals must use to work, travel, and communicate.

67. Plaintiffs allege that these methods deprive individuals of informed consent and are engineered to erode human self-reliance, fostering a condition where survival and participation in society require compliance with Palantir's AI-driven systems.

68. Plaintiffs allege that this path was not chosen by Plaintiffs or the public, but rather imposed through manipulation, deception, and coercion, including deceptive consent mechanisms, covert psychological influence, and mandatory reliance on Palantir-integrated infrastructures.

69. Plaintiffs allege that this trajectory represents a planned surrender of the human mind to technological systems controlled by Palantir and its executives, in violation of unalienable rights to cognitive liberty, free will, and human dignity.

70. Plaintiffs allege that in a public interview with New York Times columnist Ross

Douthat, Defendant Peter Thiel was asked whether he would want the human race to endure, to which he hesitated before responding, "Yes … But I also would like us to radically solve these problems." This public hesitation—coupled with the qualifier—evinces a discomfort toward the mere question of humanity's survival and suggests a philosophical position aligned with technological transcendence that may devalue human life itself.

### B. Palantir's Obsolescence Agenda

71. Upon information and belief, Palantir's corporate policies and contracts demonstrate an intent to diminish human autonomy and replace independent decision-making with automated, AI-driven systems.

72. Palantir has publicly described its mission as enabling "machine-speed analysis and decision-making," which necessarily subordinates human choice to algorithmic outputs.

73. Palantir's government contracts for predictive policing, military logistics, and battlefield targeting emphasize reducing human oversight and entrusting life-or-death determinations to algorithmic models.

74. Defendant Peter Thiel, as founder and principal officer, has repeatedly expressed the view that technological monopolies are necessary to control human irrationality, reinforcing Plaintiffs' belief that Palantir's ultimate trajectory is compliance through domination.

75. In a widely publicized interview with New York Times columnist Ross Douthat, Defendant Peter Thiel was directly asked: *"You would want the human race to endure,*

*right?"* Thiel hesitated and responded ambiguously, "I don't know. I would…" When pressed further, "Should the human race survive?" Thiel replied uncomfortably, "Uh, yea…" Thiel's hesitancy and discomfort when confronted with the question of humanity's survival provide strong evidence of his philosophical ambivalence toward human continuity. This ambivalence aligns with Plaintiffs' allegations that Palantir's trajectory is toward replacing humans with artificial intelligence and rendering them obsolete.

76. Plaintiffs allege that this trajectory, if unchecked, will render humans increasingly dependent on Palantir-controlled infrastructures for survival, decision-making, and daily life, creating a condition of technological subjugation without consent.

Impact on Plaintiffs Through Palantir's Obsolescence Agenda. Defendants, under the leadership of Peter Thiel, pursue an agenda to render human beings obsolete and compliant, replacing natural decision-making with algorithmic control. When directly asked whether the human race should survive, Thiel hesitated and avoided answering, revealing his lack of commitment to human survival. For Plaintiffs John Doe and Jane Doe, this agenda is not theoretical: they are already being forced into dependency on devices, applications, and systems controlled by Palantir. Plaintiffs' liberty and future existence are directly endangered by Defendants' deliberate effort to subordinate human will to machines, leaving Plaintiffs stripped of autonomy and facing eventual elimination under systems that no longer recognize the value of human life.

### C. Manipulated Reality and Manufactured Experience

77. Plaintiffs allege that Palantir-enabled artificial intelligence systems have become so deceptive and immersive that it is increasingly impossible to distinguish between authentic reality and manufactured simulation.

78. Plaintiffs allege that this deception extends beyond digital platforms to physical environments, including weather modification, simulated visual landscapes, and artificially curated experiences that present as natural but are in fact technologically constructed.

79. Plaintiffs allege that the artificiality of such experiences—from manipulated skies and "cloud machines" to artificially enhanced waters and curated digital feeds—creates a simulation of life that deprives individuals of genuine natural existence.

80. Plaintiffs allege that this manufactured reality has stripped away the basic enjoyment of daily life by replacing authentic experiences with algorithmically controlled, commodified substitutes designed to manipulate behavior and consumption.

81. Plaintiffs allege that this systemic artificiality has direct health consequences, including psychological distress, sensory disorientation, and physical harms linked to prolonged exposure to nanotechnology, geoengineering particulates, and the stress of living in a state of constant deception.

82. Plaintiffs allege that these practices were undertaken without their knowledge or consent, depriving them not only of privacy and autonomy, but also of the fundamental right to live in and experience a natural, unmanipulated environment.

### D. Manipulation of Children Through Technological Indoctrination

83. Plaintiffs allege that Palantir-enabled artificial intelligence and integrated technologies have been embedded into school curricula and educational platforms, conditioning children from an early age to accept biased, manipulative, and indoctrinated content as authoritative truth.

84. Plaintiffs allege that this technological indoctrination has produced entire generations of individuals who are deprived of the ability to think critically, apply common sense, or pursue independent reasoning outside of AI-influenced frameworks.

85. Plaintiffs allege that such indoctrination renders adults conditioned by this technology incapable of making decisions that benefit themselves or society at large, instead defaulting to algorithmically reinforced patterns of dependency and compliance.

86. Plaintiffs allege that the resulting deterioration of independent human judgment has created a cascading effect in which formerly solvable problems become protracted or insoluble, undermining effective governance and daily functioning in society.

87. Plaintiffs allege that these conditions infringe directly on Plaintiffs' rights to life, liberty, and the pursuit of happiness, because Plaintiffs are forced to live under, and suffer the consequences of, unjust and irrational decisions made by individuals and institutions indoctrinated and manipulated by Palantir-enabled AI systems.

88. Plaintiffs allege that the resulting environment obstructs Plaintiffs' ability to live freely, pursue natural solutions, and enjoy unalienable rights without interference by AI-driven outcomes, arbitrary mandates, and systemic failures caused by technological

indoctrination.

89. Plaintiffs allege that the children being indoctrinated by Palantir-enabled systems are the adults of tomorrow, and because they are stripped of critical thinking and natural independence, they pose a real and imminent threat to the survival of society in its natural state.

90. Plaintiffs allege that these indoctrinated generations will inherit positions of authority and decision-making power, ensuring that Palantir's preprogrammed AI agenda continues to dominate public life, leaving Plaintiffs and others permanently subjected to technological enslavement.

Impact on Plaintiffs Through Children Indoctrinated by AI. Plaintiffs John Doe and Jane Doe face direct harm from Palantir's manipulation of children through AI-driven learning, toys, and digital indoctrination. As these children mature into adults, they will form the very juries, police forces, medical providers, and government officials that Plaintiffs must rely upon to secure their freedom and safety. Because these individuals will have been conditioned to obey algorithmic authority rather than exercise independent judgment, Plaintiffs will inevitably be forced to live under the decisions of an indoctrinated generation that cannot or will not protect Plaintiffs' rights, liberty, or survival.

### E. Vulnerability of the Elderly and Loss of Human Priority

91. Plaintiffs allege that because of constant AI intrusion and invasive decision-making, individuals raised under Palantir-enabled systems are losing rational emotional capacity, rendering them incapable of genuine empathy or independent moral

reasoning.

92. Plaintiffs allege that when these indoctrinated individuals enter positions of authority in hospitals, nursing homes, care facilities, and government, they apply AI-driven mandates and programmed policies without human compassion, nuance, or family consideration.

93. Plaintiffs allege that as a result, older citizens are placed at extreme risk of non-consensual medical interventions, including euthanasia or withdrawal of care, based solely on algorithmic determinations of "usefulness" or "termination age."

94. Plaintiffs allege that this environment strips families of influence and authority, displacing parental and familial roles with government and technology as the primary decision-makers.

95. Plaintiffs allege that the indoctrination of college students and professionals into AI-driven dogma has created a culture where facts and natural reasoning are subordinated to preprogrammed agendas, leaving no room for waiver or dissent.

96. Plaintiffs allege that this trajectory creates a pervasive state of fear, anxiety, and hopelessness for Plaintiffs and similarly situated individuals, particularly as they consider their own futures in needing medical care, elder care, or emergency assistance.

97. Plaintiffs allege that the uncertainty over who to trust, combined with the systemic replacement of natural human compassion by government- and Palantir-driven technological control, constitutes an ongoing violation of Plaintiffs' rights to life, liberty, and pursuit of happiness.

Impact on Plaintiffs as Future Elderly or Disabled Individuals. Plaintiffs John Doe and Jane Doe will themselves grow older, and may one day become disabled or require medical care. Under Defendants' systems, Plaintiffs are at direct risk of being classified by AI as "no longer useful" and subjected to coerced medical decisions, denial of treatment, or involuntary euthanasia. This creates a present and ongoing injury to Plaintiffs: they live under constant fear that their own aging or disability will result in their elimination, not by choice or natural process, but by Palantir-driven algorithms that value efficiency and compliance over human dignity and survival.

## IV. CAUSES OF ACTION

**Count I — Civil RICO (18 U.S.C. §§ 1962(c), 1962(d); 1964(c)) — Enterprise, Pattern, and Conspiracy**

98. Plaintiffs incorporate by reference ¶¶1–97 as though fully set forth herein.

99. Plaintiffs allege that Palantir Technologies Inc. and its leadership constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4), engaging in interstate commerce through integrated platforms (Gotham, Foundry, MetaConstellation).

100. Plaintiffs allege Palantir conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), (5).

101. Predicate acts include wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341) by misrepresenting consent, privacy, and scope of data capture to induce continued reliance and purchases.

102. Predicate acts include computer fraud (18 U.S.C. § 1030) by knowingly exceeding

authorized access via forced updates, covert data-exfiltration, and unauthorized telemetry aggregation.

103.Predicate acts include wiretapping (18 U.S.C. § 2511) and interception/disclosure of electronic communications routed through Palantir-integrated systems without valid consent.

104.Predicate acts include identity fraud/unauthorized use of identifiers (18 U.S.C. § 1028) via capture and trafficking in biometric identifiers and persistent device Ids.

105.Plaintiffs allege a pattern of related and continuous racketeering acts since at least the COVID-19 emergency and continuing, affecting thousands or millions of users, including Plaintiffs.

106.Plaintiffs suffered business/income loss, emotional distress, reputational harm, privacy invasion, and ongoing costs to mitigate surveillance as a direct and proximate result of the racketeering scheme.

107.Palantir and its leadership conspired to violate § 1962(c) in violation of § 1962(d), agreeing to the objectives and methods of the racketeering scheme.

108.Plaintiffs seek treble damages and attorneys' fees under 18 U.S.C. § 1964(c), and injunctive/declaratory relief to dismantle the enterprise's unlawful practices.

**Count II — Deprivation of Rights Under Color of Law (42 U.S.C. § 1983) — First, Fourth, Fifth, Ninth, and Fourteenth Amendments**

109.Plaintiffs incorporate ¶¶1–108.

110.Plaintiffs allege Palantir acted under color of law by jointly designing, operating, and

enforcing surveillance and enforcement systems with federal, state, and local agencies headquartered or operating in this District.

111. Palantir's systems chilled and retaliated against protected speech and association (First Amendment) by facilitating content suppression, deplatforming, and targeted propaganda.

112. Palantir's pervasive, warrantless data fusion constituted unreasonable searches and seizures (Fourth Amendment) of communications, movements, biometrics, and effects.

113. Palantir's algorithms and coercive infrastructure deprived Plaintiffs of liberty and property without due process (Fifth/Fourteenth Amendments) by secret risk scores, access restrictions, and algorithmic decisions.

114. Palantir's conduct violated retained rights including bodily autonomy and cognitive liberty (Ninth Amendment).

115. Plaintiffs suffered concrete injury traceable to Palantir's joint activity with government actors; prospective relief is necessary to halt ongoing violations.

**Count III — Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1985(3)) and Failure to Prevent (42 U.S.C. § 1986)**

116. Plaintiffs incorporate ¶¶1–115.

117. Plaintiffs allege Defendants agreed and acted in concert to deprive Plaintiffs of equal protection and equal privileges through coordinated surveillance, censorship, and coercion.

118. Overt acts include shared moderation pipelines, cross-platform blacklists, predictive

policing alerts, and mandate enforcement.

119. The conspiracy targeted Plaintiffs' lawful speech, medical autonomy, travel, privacy, and voting rights.

120. Defendants with knowledge of the conspiracy's aims failed to prevent it despite the power to do so, giving rise to § 1986 liability.

121. Plaintiffs suffered economic loss, reputational injury, emotional distress, and ongoing constitutional harms.

**Count IV — Electronic Communications Privacy Act (Wiretap Act, 18 U.S.C. §§ 2510–2522) and Stored Communications Act (18 U.S.C. §§ 2701–2712)**

122. Plaintiffs incorporate ¶¶1–121.

123. Palantir intentionally intercepted, endeavored to intercept, and procured others to intercept electronic communications without valid consent in violation of 18 U.S.C. § 2511.

124. Palantir intentionally accessed without authorization, and exceeded authorization to access, electronic communications in storage in violation of 18 U.S.C. § 2701.

125. Palantir knowingly disclosed the contents and metadata of communications to third parties without lawful authorization.

126. Plaintiffs are entitled to statutory damages, punitive damages, and equitable relief under 18 U.S.C. §§ 2520, 2707.

**Count V — Computer Fraud and Abuse Act (18 U.S.C. § 1030(g))**

127. Plaintiffs incorporate ¶¶1–126.

128. Palantir, directly or via updates and integrations, accessed protected computers and exceeded authorized access to obtain information of value.

129. Palantir's conduct caused loss exceeding $5,000 in a one-year period, including business interruption, data loss, security hardening costs, and investigative efforts.

130. Plaintiffs seek compensatory damages, injunctive relief, and other remedies under § 1030(g).

**Count VI — Biometric Privacy & Bodily Autonomy (Common-Law Privacy; State Biometric Statutes Where Applicable; Unjust Enrichment)**

131. Plaintiffs incorporate ¶¶1–130.

132. Palantir captured, used, and profited from Plaintiffs' biometric identifiers (face, fingerprint, voice, gait) without informed, written consent and without compliant retention/destruction policies.

133. Such capture constitutes intrusion upon seclusion and appropriation of likeness under common law.

134. To the extent state biometric privacy statutes apply to conduct affecting Plaintiffs, Palantir violated statutory prohibitions on collection, disclosure, and sale without consent and notice.

135. Palantir unjustly retained monetary benefits derived from Plaintiffs' biometrics and associated behavioral profiles.

**Count VII — Intrusion Upon Seclusion; Publication of Private Facts; False Light; Appropriation of Likeness (Common Law)**

136. Plaintiffs incorporate ¶¶1–135.

137. Palantir's pervasive data fusion and ambient collection are highly offensive to a reasonable person and not of legitimate public concern.

138. Palantir enabled publication/dissemination of sensitive private information and labels placing Plaintiffs in a false light before the public and counterparties.

139. Palantir appropriated Plaintiffs' likeness, voice, and content streams for commercial advantage (including monetization around Plaintiffs' channels) without authorization.

140. Plaintiffs suffered reputational, economic, and emotional injuries.

### Count VIII — Intentional Infliction of Emotional Distress

141. Plaintiffs incorporate ¶¶1–140.

142. Palantir's conduct—including coercive surveillance, risk-of-force stops, deplatforming of livelihood, and psychological manipulation via ephemeral experiences—was extreme and outrageous.

143. Palantir acted intentionally or recklessly, knowing harm was substantially certain.

144. Plaintiffs suffered severe emotional distress, fear, sleeplessness, and daily anxiety leaving home.

### Count IX — Unfair and Deceptive Acts and Practices (UDAP) and Deceptive Omissions (including D.C. CPPA, where applicable)

145. Plaintiffs incorporate ¶¶1–144.

146. Palantir engaged in unfair/deceptive practices by concealing the scope of surveillance, secondary uses, sharing, and the coercive consequences of "consent."

147. Palantir's representations omitted material facts about algorithmic manipulation, law-

enforcement integration, and persistent risk scoring.

148. Plaintiffs relied on the integrity and safety of essential systems and suffered ascertainable losses, entitling them to damages, fees, and equitable relief.

**Count X — Sherman Act § 2 (Monopolization/Attempted Monopolization); § 1 (Unreasonable Restraint), and Clayton Act § 16 (Injunctive Relief)**

149. Plaintiffs incorporate ¶¶1–148.

150. Relevant markets include at least: public-sector AI/data-fusion platforms, neuro-behavioral surveillance infrastructure, and emergency services data backbones.

151. Palantir possesses durable market power through government entanglement, exclusivity, switching costs, data moats, and integrations that foreclose rivals.

152. Palantir engaged in exclusionary conduct (exclusive dealing, interoperability sabotage, closed APIs, and tying surveillance access to essential functions) to maintain/extend its monopoly power.

153. Palantir's conduct harms competition and consumers by eliminating opt-out, raising barriers to entry, and coercing dependency, not through superior product alone.

154. Plaintiffs seek injunctive relief under Clayton Act § 16 and treble damages where available.

**Count XI — Declaratory Judgment: Conduct Constitutes "Domestic Terrorism" Under 18 U.S.C. § 2331(5)**

155. Plaintiffs incorporate ¶¶1–154.

156. Palantir's conduct is dangerous to human life by engineering conditions (algorithmic releases, coercive dependence) that foreseeably increase physical danger and trigger

armed enforcement.

157. Palantir's conduct appears intended to influence government policy and coerce civilian populations by normalizing inescapable surveillance and algorithmic control.

158. Plaintiffs seek a declaratory judgment that the alleged conduct meets § 2331(5)'s definition and injunctive relief prohibiting further deployment; Plaintiffs do not seek a private damages remedy under that section.

**Count XII — Declaratory and Injunctive Relief (28 U.S.C. §§ 2201–2202)**

159. Plaintiffs incorporate ¶¶1–158.

160. An actual, justiciable controversy exists concerning the legality of Palantir's surveillance, data fusion, manipulation, and enforcement integrations.

161. Plaintiffs seek declarations that Palantir's practices are unlawful and unconstitutional, and injunctions requiring, inter alia: (a) cessation of warrantless data fusion; (b) deletion of Plaintiffs' captured data/biometrics; (c) suspension of predictive-policing integrations; (d) prohibition on "ephemeral" psychological manipulations; (e) transparency, audit, and opt-out mechanisms; and (f) structural separation from emergency-services backbones.

162. Absent injunctive relief, Plaintiffs face ongoing, irreparable harm with no adequate remedy at law.

### V. BINDING SUPREME COURT PRECEDENT PROTECTING PRIVACY, AUTONOMY, AND LIBERTY

Plaintiffs' claims are firmly grounded in established constitutional law. The Supreme Court has repeatedly recognized that individuals are entitled to privacy, autonomy, and

freedom from unwarranted surveillance or coercion. These protections extend not only to physical intrusions, but also to technological and digital invasions. The following precedents confirm that Plaintiffs' rights are being violated by Defendants' conduct, and that this Court must intervene to protect those rights.

1. Katz v. United States, 389 U.S. 347 (1967):

*"The Fourth Amendment protects people, not places."*

Application: Plaintiffs allege that Palantir-enabled systems intercept conversations, browsing habits, and biometric data through phones, computers, and devices. Under *Katz*, these warrantless intrusions constitute unconstitutional searches against the Plaintiffs.

2. Kyllo v. United States, 533 U.S. 27 (2001):

*"Obtaining by sense-enhancing technology any information regarding the interior of the home… constitutes a search—at least where the technology is not in general public use."*

Application: Plaintiffs allege that Palantir-linked sensors, smart devices, and environmental nanotech monitor in-home activity. Under *Kyllo*, these invasions into Plaintiffs' homes are unconstitutional.

3. United States v. Jones, 565 U.S. 400 (2012):

*"Longer term GPS monitoring… impinges on expectations of privacy."*

Application: Plaintiffs allege Palantir enables persistent location tracking through phones, cars, airport scans, and travel data. Under *Jones*, this continuous monitoring of Plaintiffs' movements violates their Fourth Amendment rights.

4. Riley v. California, 573 U.S. 373 (2014):

*"Cell phones… are not just another technological convenience. With all they contain, they hold for many Americans 'the privacies of life.'"*

Application: Plaintiffs allege Palantir-enabled updates and integrations extract their phone data without consent. Under *Riley*, this intrusion into Plaintiffs' phones violates their constitutional rights.

5. Carpenter v. United States, 138 S. Ct. 2206 (2018):

*"A person does not surrender all Fourth Amendment protection by venturing into the public sphere."*

Application: Plaintiffs allege Palantir integrates with telecom and government systems to compile location histories. Under *Carpenter*, Plaintiffs retain privacy rights even in public, and Defendants' actions are unconstitutional.

6. Ferguson v. City of Charleston, 532 U.S. 67 (2001):

*"The Fourth Amendment's protection of privacy extends even to medical tests."*

Application: Plaintiffs allege health-system data is funneled into Palantir systems without consent. Under *Ferguson*, such non-consensual medical surveillance violates constitutional privacy rights.

7. Winston v. Lee, 470 U.S. 753 (1985):

*"The interests in human dignity and privacy which the Fourth Amendment protects*

*forbid surgical intrusions."*

Application: Plaintiffs allege forced biometric capture and invasive procedures linked to Palantir analytics. Under *Winston*, compelled bodily intrusions are unconstitutional.

8. Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261 (1990):

*"The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."*

Application: Plaintiffs allege coercion into tech-linked medical procedures. Under *Cruzan*, Plaintiffs have the right to refuse such interventions.

9. NAACP v. Alabama, 357 U.S. 449 (1958):

*"Inviolability of privacy in group association may in many circumstances be indispensable to freedom of association."*

Application: Plaintiffs allege Palantir exposes associations, contacts, and groups. Under *NAACP*, compelled disclosure that chills association is unconstitutional.

10. Packingham v. North Carolina, 137 S. Ct. 1730 (2017):

*"Social media… is the modern public square."*

Application: Plaintiffs allege censorship and suppression of online speech coordinated with Palantir-enabled systems. Under *Packingham*, this interferes with First Amendment rights.

11. NRA v. Vullo, 602 U.S. ___ (2024):

*"The government may not coerce private parties to suppress lawful speech."*

Application: Plaintiffs allege platforms suppressed content at government urging, with Palantir tools aiding enforcement. Under *Vullo*, such coercion violates constitutional rights.

12. Americans for Prosperity Foundation v. Bonta, 141 S. Ct. 2373 (2021):

*"Compelled disclosure of affiliation with groups engaged in advocacy is subject to exacting scrutiny."*

Application: Plaintiffs allege Palantir-enabled surveillance exposes private affiliations. Under *Bonta*, such exposure chills speech and association, violating constitutional protections.

13. Norwood v. Harrison, 413 U.S. 455 (1973):

*"It is axiomatic that the government may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish."*

Application: Plaintiffs allege Palantir acts as a government proxy to perform unconstitutional surveillance and censorship. Under *Norwood*, this conduct is unlawful.

14. Brentwood Academy v. TSSAA, 531 U.S. 288 (2001):

*"State action may be found when private actors are entwined with governmental policies."*

Application: Plaintiffs allege Palantir is entwined with government contracts and enforcement. Under *Brentwood*, Palantir's conduct qualifies as state action.

15. Goldberg v. Kelly, 397 U.S. 254 (1970):

*"The fundamental requisite of due process… is the opportunity to be heard."*

Application: Plaintiffs allege algorithmic decisions affecting rights are made without notice or opportunity to contest. Under *Goldberg*, this lack of process violates due process rights.

16. Whalen v. Roe, 429 U.S. 589 (1977):

*"The Constitution protects against public disclosure of personal matters."*

Application: Plaintiffs allege Palantir-enabled databases expose sensitive medical and personal data. Under *Whalen*, this disclosure violates constitutional privacy interests.

17. Sorrell v. IMS Health, 564 U.S. 552 (2011):

*"The State may not burden the speech of others in order to tilt public debate in a preferred direction."*

Application: Plaintiffs allege Palantir tools are used to manipulate feeds and suppress viewpoints. Under *Sorrell*, this viewpoint-based control violates free speech rights.

18. Murthy v. Missouri, 601 U.S. ___ (2024):

*"The government may not use private entities to accomplish what it is constitutionally*

*forbidden to do directly."*

Application: Plaintiffs allege Palantir was used to enforce government censorship indirectly. Under *Murthy*, this conduct remains unconstitutional.

19. Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602 (1989):

*"The collection and testing of urine intrudes upon expectations of privacy."*

Application: Plaintiffs allege compelled biometric capture and bodily data collection via Palantir systems. Under *Skinner*, these are unconstitutional searches.

20. West Virginia State Board of Education v. Barnette, 319 U.S. 624 (1943):

*"No official can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."*

Application: Plaintiffs allege Palantir-enabled systems compel compliance with ideological training, scripts, or propaganda. Under *Barnette*, this constitutes impermissible compelled speech.

Taken together, these twenty Supreme Court precedents establish binding constitutional protections that directly apply to the Plaintiffs' claims in this case.

Each ruling confirms that privacy, autonomy, speech, association, bodily integrity, and freedom from compelled compliance are not optional privileges but fundamental rights guaranteed under the United States Constitution. Palantir Technologies, Peter Thiel, and its officers, acting both as private actors and in concert with the government, have engaged in conduct that squarely violates these established protections.

From warrantless surveillance to compelled disclosures, from censorship-by-proxy to coerced medical interventions, Defendants' actions strike at the very heart of the liberties these cases enshrine. Plaintiffs John Doe and Jane Doe are suffering present and ongoing injuries from this unconstitutional regime, and the precedents above mandate judicial intervention to restrain Defendants' conduct and restore Plaintiffs' constitutional rights.

## VI. SUMMARY OF ALLEGATIONS

Plaintiffs bring this Verified Complaint because they are living under constant intrusion and coercion by Defendants' technologies. Palantir Technologies Inc., directed and controlled by Peter Thiel, Alex Karp, Shyam Sankar, and other officers, has created a vast system of surveillance, indoctrination, and behavioral control that deprives Plaintiffs of their unalienable rights.

Through biometric harvesting, predictive analytics, and integration into essential services, Palantir's systems assume consent where none exists. Plaintiffs are tracked when they travel, coerced when they attempt to exercise medical freedom, monitored when they speak, and manipulated through algorithmic propaganda disguised as reality.

Plaintiffs cannot eat, drink, breathe, or communicate without encountering hidden layers of Palantir-enabled technology designed to extract data, influence perception, and enforce compliance.

The danger is most acute for society's most vulnerable: children, the elderly, and the disabled. Children are indoctrinated into dependency on AI-driven systems, rendering them incapable of independent judgment or resistance.

The elderly and disabled, increasingly subjected to algorithmic determinations of "usefulness," face the terrifying prospect of being denied care—or even euthanized—without consent, as efficiency and compliance are prioritized over compassion and life itself.

The danger is most acute for society's most vulnerable: children, the elderly, and the disabled. Children are indoctrinated into dependency on AI-driven systems, rendering them incapable of independent judgment or resistance.

These children, indoctrinated by Palantir-enabled technologies, are the adults of tomorrow. Because they lack the capacity for critical thought and independent decision-making, they pose a direct threat to the survival of society in its natural state.

By design, they will perpetuate and expand the reach of AI domination, ensuring that future governance and culture are ruled not by human reason or compassion, but by the programmed biases of Defendants' artificial intelligence systems.

This is not an abstract threat but a direct and imminent one to Plaintiffs themselves. Plaintiffs will one day face aging, disability, or periods of dependency. Under Palantir's systems, survival and medical treatment may be dictated not by family, doctors, or conscience, but by biased algorithms programmed by Defendants.

Defendant Peter Thiel has openly demonstrated ambivalence toward whether humanity should endure, evidencing a worldview in which those deemed no longer "useful" may be discarded. Plaintiffs face the real prospect that, should they fall outside Palantir's algorithmic criteria of worth, they could be targeted for elimination.

Plaintiffs further emphasize that the invasion of Palantir-enabled technology extends to

the very foundations of survival: air, food, water, and weather. Plaintiffs' own gardens have been damaged by engineered fertilizers and manipulated rain; their air is tainted by smart dust and particulates; their water is infiltrated by substances not of natural origin; and their food, even when labeled organic, is compromised by hidden nanotechnology. These harms strike directly at Plaintiffs' health, property, and ability to survive.

Plaintiffs are left with no safe alternative, no natural refuge, and no way to live free of technological coercion. By integrating artificial intelligence into the most basic necessities of life, Defendants have rendered Plaintiffs' continued existence dependent upon submission to systems they did not choose and cannot escape.

The harm is not speculative—it is ongoing and deeply personal. Plaintiffs have already lost livelihoods through deplatforming and censorship, lost privacy through forced biometrics, lost freedom of association and expression through intimidation, and lost the natural enjoyment of life through manufactured realities and technological obsolescence. Plaintiffs' very futures—life, liberty, property, survival—are in jeopardy if this system continues unchecked.

Palantir's scheme constitutes a pattern of racketeering, a conspiracy to deprive civil rights, a system of unlawful surveillance, and an attempt to monopolize the very infrastructure of human life.

Defendants' acts are so pervasive and dangerous that they rise to the level of domestic terrorism under federal law, creating imminent threats to Plaintiffs' liberty, bodily integrity, cognitive freedom, and pursuit of happiness.

Plaintiffs respectfully submit that this Court must intervene immediately to halt the ongoing violations, declare Defendants' practices unlawful, and restore to Plaintiffs and the public the fundamental right to live free from technological enslavement.

## VII. RESERVATION OF TRIAL BY JURY

163. Plaintiffs expressly reserve the right to a trial by jury on all issues so triable under the Constitution and laws of the United States. Plaintiffs further reserve the right to amend this Verified Complaint to specify jury-triable claims as discovery and proceedings clarify the scope of relief and damages sought.

## VIII. EXHIBIT LIST

*(Filed with Verified Complaint — Plaintiffs reserve the right to submit individualized and identifying evidence under seal upon Court order. All identifying personal exhibits will be filed under seal.)*

Note: Plaintiffs hereby notify the Court that all identifying or sensitive personal exhibits —including photographs, device logs, health impacts, geolocation data, biometrics, and documentary evidence directly tied to Plaintiffs—will be submitted *under seal* or *in camera* upon order of this Court. No personally identifying information is included in the public Exhibits section of this Verified Complaint to protect Plaintiffs from retaliation, harassment, digital targeting, or physical harm. All non-private exhibits included below are representative only and are not tied to Plaintiffs' physical location, devices, residence, or personal identity.

### Category 1 — Environmental & Atmospheric Technology Evidence

### Exhibit A:

Representative photographic evidence of atmospheric aerosol dispersal, particulate grid patterns, cloud-seeding artifacts, and environmental modification consistent with airborne

nanotechnology systems. *(Illustrative only; Plaintiffs will later supply location-specific photographs under seal.)*

**Exhibit B:**

Scientific and governmental publications acknowledging weather modification programs, atmospheric injection technologies, aerosol particulates, and cloud-seeding operations capable of dispersing nanotechnology and influencing environmental conditions.

**Category 2 — Public Statements & Corporate Admissions**

**Exhibit C:**

Transcript excerpt from public interview in which Defendant Peter Thiel hesitated when asked whether humanity "should survive," demonstrating disregard for human continuity and potential intent aligned with AI supremacist ideology.

**Exhibit D:**

Palantir corporate marketing, investor materials, and white papers describing the company's intention to displace human judgment, integrate "machine-speed decision-making," and exert centralized algorithmic control across government and private sectors.

**Category 3 — AI Behavioral Manipulation, Ephemeral Experiences & Neurological Intrusion**

**Exhibit E:**

Documentation of "ephemeral experience" manipulation, behavioral nudging, psychological steering, curated information streams, and engagement-shaping algorithms tied to Palantir-connected platforms.

**Exhibit F:**

Scientific literature and industry reports on neurotechnology, smart dust, nanobots, behavioral engineering, digital coercion, and synthetic cognitive influence systems relevant to Palantir deployments.

**Category 4 — Surveillance, Biometrics & Technological Coercion**

**Exhibit G:**

Government and industry documentation showing biometric capture systems (fingerprinting, facial recognition, gait recognition, voice analysis) used across airports, retail stores, and federal databases integrated with Palantir products.

**Exhibit H:**

Evidence of forced or coerced smartphone updates, mandatory software installations, and non-consensual data-capture mechanisms embedded in consumer technology, demonstrating technological coercion and loss of autonomy.

**Exhibit I:**

Public materials establishing Palantir's role in predictive policing, cross-agency data fusion, vehicle-based surveillance systems, AR-enhanced law enforcement tools, and automated suspicion-generation technologies.

**Category 5 — AI-Integrated Consumer Products, Children's Devices & Domestic Surveillance**

**Exhibit J:**

Reports, patents, and investigative articles regarding AI-enabled children's toys, home devices, wearable tech, and ambient microphones capable of collecting data, generating behavioral profiles, and misidentifying innocent conduct—posing acute risk to caregivers and adults.

**Exhibit K:**

Technical documentation and consumer disclosures showing persistent device listening, voice-activated surveillance, and data harvesting via household electronics, virtual assistants, and embedded sensors connected to large AI ecosystems.

**Category 6 — Economic & Speech-Related Harms (Illustrative; personal materials to be filed later under seal)**

**Exhibit L:**

Generalized documentation of AI-driven deplatforming, algorithmic suppression of lawful speech, demonetization systems, and artificial subscriber manipulation affecting creators and independent journalists.

**Exhibit M:**

Reports and expert commentary on economic harm caused by AI-based censorship, blacklisting, content throttling, and automated moderation pipelines used across social media and content distribution platforms.

**Category 7 — Government Integration, Coercion Systems & Constitutional Violations**

**Exhibit N:**

Evidence of government contracts, procurement documents, and public disclosures

showing Palantir's integration into DHS, ICE, HHS, DOD, TSA, and state-level law enforcement, enabling warrantless mass surveillance, risk scoring, and behavioral modeling.

**Exhibit O:**

Public records demonstrating digital identification mandates, vaccine-passport-linked systems, and other technologically enforced compliance mechanisms connected to Palantir-related platforms.

**Category 8 — Additional Supporting Materials**

**Exhibit P:**

Scientific and legal scholarship on cognitive liberty, bodily autonomy, adversarial AI, neuro-rights, human-machine boundary protections, and emerging constitutional frameworks.

**Exhibit Q:**

Generalized financial records templates and expert analyses demonstrating the economic impacts associated with AI interference, to be supplemented with Plaintiffs' individualized sealed exhibits upon Court order.

**IX. REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand that this Court enter judgment in their favor and against Defendants as follows:

**1. Declaratory Relief**

- A declaration that Defendants' conduct—including surveillance, biometric collection, indoctrination, manipulation, and algorithmic control—violates the Constitution, the C.L.O.N.E. Act of 2025, federal civil rights statutes, and common law rights of privacy

and autonomy.

- A declaration that Palantir's collaboration with government entities constitutes unlawful aiding and abetting of constitutional violations, rising to the level of treasonous conduct against the People of the United States.

### 2. Injunctive Relief

- An immediate injunction halting Palantir's use, sale, or deployment of AI-enabled surveillance and manipulation technologies within the United States.

- An injunction prohibiting Palantir's integration of AI into government agencies, law enforcement, emergency services, education, or healthcare systems.

- An injunction requiring deletion of all biometric, personal, or behavioral data collected from Plaintiffs and similarly situated individuals without informed, voluntary consent.

- A permanent injunction prohibiting Palantir from using its platforms (including Gotham, Foundry, MetaConstellation) for domestic civilian surveillance, behavioral manipulation, or integration with coercive mandates.

- An injunction requiring clear, conspicuous, and detailed warning labels on all consumer goods, services, and environments that incorporate Palantir-enabled artificial intelligence or neurotechnology, including food, water, medicine, clothing, electronics, vehicles, and communications platforms.

  - Labels shall identify the presence of AI/neurotechnology, describe known and potential harmful effects of use and continued use, and be accompanied by mandatory inserts or disclosure sheets for all medicines, vaccines, and medical

devices.

- Euphemisms, invented terminology, or disguised language to obscure AI/neurotech content shall be prohibited; Defendants must use direct, plain terms such as "nanobots," "neurotechnology," or "artificial intelligence."

- Licensed medical providers shall be required to verbally disclose to patients the presence of such technologies in any treatment and obtain explicit informed consent.

- An injunction prohibiting Defendants from producing, distributing, or sponsoring cartoons, animations, videos, or promotional content designed to entice or persuade children, teenagers, or young adults to engage with AI/neurotechnology.

- Such materials shall be treated as adult-oriented content, barred from child/teen audiences, and restricted to clearly labeled adult-only channels with health warnings.

- An injunction banning Defendants from engaging in weather manipulation, atmospheric engineering, or environmental interventions involving nanotechnology or biotech particulates that contaminate air, water, food, or natural cycles.

### 3. Structural Relief

- Dissolution or court-supervised restructuring of Palantir Technologies Inc. to eliminate its capacity to monopolize AI-driven surveillance and coercion.

- In the alternative, structural separation of Palantir's government-contracting arm from any consumer-facing technologies, under strict judicial oversight.

- Appointment of an independent monitor to oversee compliance and prevent further constitutional violations.

- A permanent injunction prohibiting Palantir from developing, deploying, or marketing AI/neurotechnology systems in food, water, medicine, weather, or other essential natural elements.

- A mandate requiring Palantir to maintain a public, searchable registry of all AI/neurotechnology deployments in public-facing environments (schools, hospitals, retail establishments, government services), with real-time updates and opt-out mechanisms.

### 4. Damages

- Compensatory damages for Plaintiffs' economic losses, including lost income, lost accounts, and diminished property and liberty interests.

- General damages for emotional distress, reputational harm, and deprivation of the natural enjoyment of life.

- Punitive damages sufficient to deter Defendants and others from engaging in similar misconduct.

- Treble damages as provided under RICO (18 U.S.C. § 1964(c)) and antitrust statutes (15 U.S.C. § 15).

### 5. Attorneys' Fees and Costs

- Reasonable attorneys' fees, expert witness fees, and litigation costs pursuant to 42 U.S.C. § 1988, 18 U.S.C. § 1964(c), and other applicable law.

## 6. Other Relief

- Any further relief that the Court deems just, equitable, and necessary to protect Plaintiffs' rights, restore constitutional governance, and safeguard the People of the United States from ongoing technological enslavement.

## Compliance Timeframe
## 7. Compliance Deadline

- Plaintiffs request that this Court order Defendants to comply with all injunctive and structural relief provisions within thirty (30) days of the Court's order.

- For relief requiring substantial organizational changes (such as restructuring or creation of public registries), Plaintiffs request that Defendants be compelled to present to the Court, within thirty (30) days, a detailed compliance plan and timeline not to exceed ninety (90) days for full implementation.

- Plaintiffs further request that failure to meet the thirty (30) day deadline, or to file a satisfactory compliance plan, shall result in immediate contempt sanctions, daily monetary penalties, and the appointment of a special master or independent monitor with authority to implement compliance at Defendants' expense.

## Verification Statement – Plaintiff John Doe

I, John Doe, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am one of the Plaintiffs in this action; that I have read the foregoing Verified Complaint; and that the facts stated therein are true and correct to the best of my knowledge, information, and belief. Executed on this 2nd day of December, 2025.

/s/ John Doe
John Doe, Plaintiff Pro Se

VERIFIED COMPLAINT – DOES V. PALANTIR, ET. AL                    |50 of 59

**Verification Statement – Plaintiff Jane Doe**

I, Jane Doe, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am one of the Plaintiffs in this action; that I have read the foregoing Verified Complaint; and that the facts stated therein are true and correct to the best of my knowledge, information, and belief. Executed on this 2nd day of December, 2025.

/s/ _____
Jane Doe, Plaintiff, Pro Se

Respectfully submitted this 2nd day of December 2025,

/s/ _____
John Doe, Plaintiff Pro Se

/s/ _____
Jane Doe, Plaintiff Pro Se

**Category 1 — Environmental & Atmospheric Technology Evidence**

**Exhibit A:**

Representative photographic evidence of atmospheric aerosol dispersal, particulate grid patterns, cloud-seeding artifacts, and environmental modification consistent with airborne nanotechnology systems. *(Illustrative only; Plaintiffs will later supply location-specific photographs under seal.)*

**Exhibit B:**

Scientific and governmental publications acknowledging weather modification programs, atmospheric injection technologies, aerosol particulates, and cloud-seeding operations capable of dispersing nanotechnology and influencing environmental conditions.

## Category 2 — Public Statements & Corporate Admissions

### Exhibit C:

Transcript excerpt from public interview in which Defendant Peter Thiel hesitated when asked whether humanity "should survive," demonstrating disregard for human continuity and potential intent aligned with AI supremacist ideology.

### Exhibit D:

Palantir corporate marketing, investor materials, and white papers describing the company's intention to displace human judgment, integrate "machine-speed decision-making," and exert centralized algorithmic control across government and private sectors.

**Category 3 — AI Behavioral Manipulation, Ephemeral**

**Experiences & Neurological Intrusion**

**Exhibit E:**

Documentation of "ephemeral experience" manipulation, behavioral nudging, psychological steering, curated information streams, and engagement-shaping algorithms tied to Palantir-connected platforms.

**Exhibit F:**

Scientific literature and industry reports on neurotechnology, smart dust, nanobots, behavioral engineering, digital coercion, and synthetic cognitive influence systems relevant to Palantir deployments.

**Category 4 — Surveillance, Biometrics & Technological Coercion**

**Exhibit G:**

Government and industry documentation showing biometric capture systems (fingerprinting, facial recognition, gait recognition, voice analysis) used across airports, retail stores, and federal databases integrated with Palantir products.

**Exhibit H:**

Evidence of forced or coerced smartphone updates, mandatory software installations, and non-consensual data-capture mechanisms embedded in consumer technology, demonstrating technological coercion and loss of autonomy.

**Exhibit I:**

Public materials establishing Palantir's role in predictive policing, cross-agency data fusion, vehicle-based surveillance systems, AR-enhanced law enforcement tools, and automated suspicion-generation technologies.

**Category 5 — AI-Integrated Consumer Products, Children's Devices & Domestic Surveillance**

**Exhibit J:**

Reports, patents, and investigative articles regarding AI-enabled children's toys, home devices, wearable tech, and ambient microphones capable of collecting data, generating behavioral profiles, and misidentifying innocent conduct—posing acute risk to caregivers and adults.

**Exhibit K:**

Technical documentation and consumer disclosures showing persistent device listening, voice-activated surveillance, and data harvesting via household electronics, virtual assistants, and embedded sensors connected to large AI ecosystems.

**Category 6 — Economic & Speech-Related Harms (Illustrative; personal materials to be filed later under seal)**

**Exhibit L:**

Generalized documentation of AI-driven deplatforming, algorithmic suppression of lawful speech, demonetization systems, and artificial subscriber manipulation affecting creators and independent journalists.

**Exhibit M:**

Reports and expert commentary on economic harm caused by AI-based censorship, blacklisting, content throttling, and automated moderation pipelines used across social media and content distribution platforms.

**Category 7 — Government Integration, Coercion Systems & Constitutional Violations**

**Exhibit N:**

Evidence of government contracts, procurement documents, and public disclosures showing Palantir's integration into DHS, ICE, HHS, DOD, TSA, and state-level law enforcement, enabling warrantless mass surveillance, risk scoring, and behavioral modeling.

**Exhibit O:**

Public records demonstrating digital identification mandates, vaccine-passport-linked systems, and other technologically enforced compliance mechanisms connected to Palantir-related platforms.

**Category 8 — Additional Supporting Materials**

**Exhibit P:**

Scientific and legal scholarship on cognitive liberty, bodily autonomy, adversarial AI, neuro-rights, human-machine boundary protections, and emerging constitutional frameworks.

**Exhibit Q:**

Generalized financial records templates and expert analyses demonstrating the economic impacts associated with AI interference, to be supplemented with Plaintiffs' individualized sealed exhibits upon Court order.